**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PAMELA KIBBONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-01468 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| TAFT SCHOOL DISTRICT 90, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Pamela Kibbons served as the superintendent of Defendant Taft School District

90 ("Taft") in Lockport, Illinois, for two years. Defendant Anthony Peloso was the president of

Taft's School Board ("Board") during the same time. During Kibbons's tenure as superintendent,

she had a series of encounters with Peloso that she found uncomfortable, inappropriate, and

threatening. Kibbons complained about Peloso, and the Board subsequently gave Kibbons

negative performance evaluations. Kibbons ultimately resigned from her position. She has now

sued Taft and Peloso, asserting claims for hostile work environment and constructive discharge

under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as well as

state-law claims for breach of contract, defamation, and intentional infliction of emotional

distress. Defendants have moved to dismiss Kibbons's Complaint pursuant to Federal Rule of

Civil Procedure 12(b)(6). (Dkt. No. 8.) For the reasons stated below, Defendants' motion is

granted in part and denied in part.

## BACKGROUND

For the purposes of Defendants' motion to dismiss, the Court accepts as true the well-

pleaded facts in the Complaint and views them in the light most favorable to Kibbons as the non-

moving party. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826–27 (7th Cir. 2015). The Complaint alleges as follows.

Kibbons, who has a doctorate in education, works in the administration of elementary education. (Compl. ¶ 7, Dkt. No. 1.) In June 2016, she started in the position of school district superintendent for Taft. (*Id.* ¶ 6.) In that position, she administered and managed the district's schools, developed administrative policies, implemented Board policy, and delegated responsibility to other employees. (*Id.* ¶ 11.)

Kibbons and Taft agreed that the Board had to evaluate her performance at least once a year using standards developed by Kibbons and the Board. (*Id.* ¶ 13.) In January 2017, the members of the Board prepared their final performance ratings for Kibbons's first year as superintendent. (*Id.* ¶ 17.) When asked to rate aspects of her performance, six of the seven Board members ranked her as either proficient or distinguished in each category. (*Id.* ¶ 18.) Six of the Board members also wrote reviews of Kibbons's performance that were positive or mostly positive. (*Id.* ¶¶ 21–26.) The seventh member did not rate Kibbons as distinguished in any category and authored a written review that was mostly critical. (*Id.* ¶ 27.) The reviews did not identify Board members by name. (*Id.* ¶ 19.)

During her time at Taft, Kibbons endured what she describes as a hostile work environment. (*Id.* ¶ 29.) On several occasions between September 2016 and November 2016, Peloso asked Kibbons after business hours if she would like to go across the street to a cemetery and drink alcohol. (*Id.* ¶¶ 30–31.) Kibbons said no and told Peloso she was going home to her husband. (*Id.* ¶ 32.) Several times between September 2016 and June 2017, Peloso came into Kibbons's office for a long time to sit and watch her work. (*Id.* ¶ 33.) On two occasions, Peloso directed Kibbons to climb a ladder from the mechanical room to the rooftop so that she could see

2

possible problems with the roof. (*Id.* ¶ 34.) Both times, Kibbons was wearing a skirt and high heels, and Peloso directed her to climb the ladder first. (*Id.* ¶¶ 36–37.)

Kibbons experienced additional behavior from Peloso that she considered harassing or demeaning. In October 2017, Peloso told Kibbons during a phone call, "You are just like all the rest of them with your big fancy degrees." (*Id.* ¶ 38.) Kibbons describes Peloso's tone, volume, and demeanor as hostile and aggressive. (*Id.* ¶ 39.) On several other occasions, Peloso would correct Kibbons and then emphasize that he, unlike Kibbons, did not have a Ph.D. (*Id.* ¶ 41.) Peloso regularly emailed Kibbons after 8:00 p.m. or on weekends and demanded a response by the close of business the following day, even though the issues were not urgent. (*Id.* ¶ 42.) Peloso's harassing behavior—and the frequent comments from Board members and staff acknowledging that behavior—had a significant impact on Kibbons's health and marriage. (*Id.* ¶ 40.)

At a Board meeting in July 2017, Kibbons informed the Board that Taft's financial books and records had not balanced since 2001. (*Id.* ¶ 43.) She said that the Board should have been aware of this problem because Peloso had served on the Board throughout that time. (*Id.* ¶ 44.) Kibbons proposed to have a staff member begin reconciling Taft's books and records. (*Id.* ¶ 45.) After Kibbons made that presentation to the Board, Peloso's demeanor toward Kibbons became more aggressive and hostile. (*Id.* ¶ 47.) He began to email requests to Kibbons that were time consuming and impossible to complete in the time frame he requested. (*Id.* ¶ 48.)

At a Board meeting in September 2017, Kibbons told the Board that she felt Peloso was attacking her through constant emails and interactions. (*Id.* ¶ 50.) One Board member spoke up in Kibbons's favor. (*Id.* ¶¶ 51–52.) At another Board meeting in November 2017, Kibbons told the Board that technicians had repaired the boiler system in a Taft school at her direction. (*Id.* ¶ 53.) Peloso became irate that Kibbons had not sought approval for this expense. (*Id.* ¶ 54.) He lost his

temper, raised his voice, and began yelling that Kibbons had to get prior approval for expenses. (*Id.* ¶ 55.) While pounding the table, Peloso asked Kibbons, "Do you get that through your head? Jesus Christ." (*Id.*) Kibbons, who was sitting close to Peloso, feared for her safety. (*Id.* ¶ 57.) She stood up, said she was not feeling well, and left the room. (*Id.* ¶ 58.) Once out of the room, Kibbons began to cry and felt physically ill and unsafe. (*Id.* ¶ 59.) Soon after, Kibbons returned to the meeting, which continued as if nothing had happened. (*Id.* ¶¶ 60–61.)

Shortly after that Board meeting, several Board members contacted or visited Kibbons to ask if she was alright. (*Id.* ¶ 62.) One Board member emailed the rest of the Board an article about successful school board meetings. (*Id.* ¶ 63.) Someone also brought the meeting to the attention of the Board's attorney. (*Id.* ¶ 64.) Kibbons contacted the legal counsel at the Illinois Association of School Administrators ("IASA"), of which she is a member. (*Id.* ¶¶ 65, 67.) She told the legal counsel that she did not feel safe sitting next to or being alone with Peloso and that she would not meet with him alone in the future. (*Id.* ¶ 67.) At a December 2017 Board meeting, after Kibbons was dismissed from the meeting, Peloso apologized for his behavior at the previous month's meeting. (*Id.* ¶ 68.) But he never apologized to Kibbons. (*Id.* ¶ 69.) Shortly after that Board meeting, IASA's legal counsel registered a formal complaint with the Board's counsel on Kibbons's behalf. (*Id.* ¶ 70.) A few weeks later, IASA's legal counsel contacted the Board's counsel again to complain about Peloso's behavior toward Kibbons. (*Id.* ¶ 78.) The Board's counsel said he would address the problem with Peloso immediately. (*Id.* ¶ 79.)

Kibbons also alleges that she saw Peloso violate state laws on open meetings and freedom of information. (*Id.* ¶ 74.) On numerous occasions throughout her tenure, Peloso turned off the recording device during a closed session while the Board discussed topics that were not appropriate for a closed session. (*Id.*) After the Board finished discussing those topics, he would

turn the recording device back on and say that the meeting was continuing after the device's batteries were replaced. (*Id.* ¶ 75.) Whenever Kibbons challenged him over this behavior, Peloso would admonish her for challenging him while the recorder was on. (*Id.* ¶ 76.) No other Board members commented on Peloso's activity with the recording device. (*Id.* ¶ 77.)

In February 2018, toward the end of Kibbons's second year as superintendent, the Board held its annual superintendent evaluation conference. (*Id.* ¶ 80.) At that meeting, Peloso admitted that he got mad at Kibbons. (*Id.* ¶ 81.) Also during that meeting, the Board changed the rating system for evaluating the superintendent position to a point system with a 0–3 scale. (*Id.* ¶¶ 82, 86.) This was the first time Kibbons was aware that the evaluation system would be altered. (*Id.* ¶ 83.) According to Kibbons, the new evaluation system violates both her contract with Taft and the Board's policies. (*Id.* ¶¶ 84–85; *cf.* Mem. in Supp. of Mot. to Dismiss, Ex. A, Employment Contract at 2, Dkt. No. 9-1.)[1] When Board members submitted her evaluations, Kibbons scored relatively low compared to the previous year. (*Id.* ¶ 87.) Her averaged score was 2.0 or less in most categories, and her highest score was 2.43. (*Id.*)

Kibbons asked for clarification on the evaluation procedures and expressed concern that some Board members had left sections blank. (*Id.* ¶ 91.) Kibbons asked to view the responses from all Board members instead of just her averaged scores, but Peloso refused to show her the members' individual responses. (*Id.* ¶ 92.) Kibbons also asked to meet with the full Board to discuss the evaluations. (*Id.* ¶ 93.) Peloso denied her request and instead said that only he and one

---

[1] Documents attached to a motion to dismiss are considered part of the pleadings if they are referenced in the complaint and central to the plaintiff's claims. *See Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (citing *Venture Assocs. v. Zenith Data Sys.*, 987 F.2d 429, 431 (7th Cir. 1993)). The two documents Defendants attached to their motion—Kibbons's employment contract with Taft and her letter of resignation—are mentioned in the complaint and central to her claim, so the Court may consider them for the purposes of a motion to dismiss. The Court may also consider the EEOC charge and right-to-sue letter attached to Kibbons's Complaint for the same reasons.

other Board member would meet with her. (*Id.* ¶ 95.) A few days later, Peloso emailed Kibbons

and said again that he would not provide Board members' evaluations to Kibbons, just the

averaged scores. (*Id.* ¶ 96.) Kibbons responded by email and restated her concerns. (*Id.* ¶ 97.)

Despite the conflicts between Kibbons and Peloso, Taft offered Kibbons a one-year

extension of her contract that would last through June 2019. (*Id.* ¶ 98.) Kibbons declined to accept

the extension and, in April 2018, she tendered her letter of resignation, effective at the end of the

school year. (*Id.*; Mem. in Supp. of Mot. to Dismiss, Ex. B., Resignation Letter at 1, Dkt. No. 9-

2.) Peloso emailed the Board's counsel and complained about Kibbons's refusal of the contract

extension. (*Id.* ¶ 99.) He also called Taft staff members to ask if they knew about Kibbons's

resignation before he did. (*Id.* ¶ 100.) He stated in those calls that he was the boss, not Kibbons.

(*Id.*) During at least one call, Peloso told a staff member that he disliked Kibbons. (*Id.* ¶ 101.)

At a May 2018 transition meeting, Kibbons reiterated that she did not feel comfortable

meeting with Peloso. (*Id.* ¶ 102.) At that meeting, the Board's vice president told Board members

about ways in which Peloso had treated Kibbons with disrespect. (*Id.* ¶ 103.)

At a September 2018 meeting, after Kibbons had left Taft, Peloso told the Board that he

had "searched for Kibbons on the internet and ha[d] found her." (*Id.* ¶ 104.) He also told the

Board that "I will do what I can to ruin her." (*Id.* ¶ 105.) At his direction, Taft's interim

superintendent filed freedom of information requests with a public high school district in Rockton,

Illinois, asking for documents related to Kibbons's former employment at the Rockton district.

(*Id.* ¶ 106.)

In December 2018, Kibbons was invited to meet with a school district in Lyons, Illinois,

regarding an open superintendent position. (*Id.* ¶ 107.) But one day later, she received a call from

the search firm handling the hiring process and was told that she was no longer being considered

for the job. (*Id.* ¶ 108.) She called Patrick Patlak, an interim superintendent at another district who was involved in the hiring process, to ask for feedback. (*Id.* ¶ 110.) Patlak told Kibbons that the new interim superintendent at Taft was a good friend and former business partner of his. (*Id.* ¶ 110.) Patlak also said that he was familiar with Taft and knew a lot of people there. (*Id.* ¶ 111.) He declined to give Kibbons feedback on her interview. (*Id.* ¶ 112.)

Kibbons filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 9, 2018. (*Id.* ¶ 113.) The charge alleged that she had experienced sexual harassment and unlawful retaliation.[2] (Compl., Ex. A at 2, Dkt. No. 1-2.) She received her right to sue letter from the EEOC by the end of that month. (Compl. ¶ 113.)

On February 28, 2019, Kibbons filed her present lawsuit against Taft and Peloso. Her complaint includes four counts: the first count asserts a claim against Taft under Title VII for hostile work environment and constructive discharge based on sex discrimination; the second count alleges breach of contract against both Defendants; the third count is for defamation against both Defendants; and the fourth count asserts a claim for intentional infliction of emotional distress against both Defendants. Defendants have moved to dismiss all four claims.

### DISCUSSION

To survive a motion under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

---

[2] Kibbons's Complaint does not contain a count for retaliation under Title VII.

for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014)

(quoting *Iqbal*, 556 U.S. at 678).

## I.     Count I: Title VII

Kibbons's only federal claim arises under Title VII. She asserts that Taft discriminated

against her based on sex and characterizes her claim as a "compound hostile-environment

constructive discharge claim." (Resp. in Opp'n to Mot. to Dismiss at 4, Dkt. No. 12.) But the

Seventh Circuit has made clear that hostile work environment and constructive discharge are

distinct theories under Title VII. *See Hertzberg v. SRAM Corp.*, 261 F.3d 651, 657 (7th Cir.

2001). Therefore, the Court analyzes each separately.

### A.     Hostile Work Environment

To state a claim based on a hostile work environment under Title VII, Kibbons must allege

that "(1) she was subjected to unwelcome harassment, (2) the harassment was based on her sex,

(3) the harassment was sufficiently severe or pervasive so as to alter the condition of her

employment and create a hostile or abusive atmosphere, and (4) there is a basis for employer

liability." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). A hostile work

environment must be "both objectively and subjectively offensive." *Id.* at 941. Objective

offensiveness is determined by evaluating "the totality of the circumstances," which include "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *Alamo v. Bliss*, 864 F.3d 541, 549–50 (7th Cir. 2017) (internal

quotation marks and citation omitted). And "although a workplace need not be hellish to

constitute a hostile work environment . . . [it] must be so pervaded by discrimination that the

terms and conditions of employment [a]re altered." *Id.* at 550 (internal quotation marks and

citations omitted). Such discrimination "need not involve sexual conduct;" it is enough to show that "the work environment was sexist." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018).

Kibbons has adequately pleaded the first two elements of a hostile work environment claim. Accepting her allegations as true, she suffered unwanted harassment that was based on her sex—with the sex-based nature of the harassment being suggested by, among other things, Peloso's conduct in asking Kibbons to drink with him in the graveyard and to climb up a ladder in front of him in a skirt and high heels.

The third element, whether the harassment was severe enough to change Kibbons's conditions of employment, is perhaps a closer call. "[I]solated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002). But it is usually inappropriate to dismiss a plaintiff's hostile work environment claim at the pleadings stage on the basis that the conduct she has alleged was not abusive enough. *See Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 834 (7th Cir. 2015) ("[I]t is premature at the pleadings stage to conclude just how abusive [plaintiff's] work environment was. . . . It may be that [plaintiff] . . . cannot produce evidence to survive summary judgment. But that question can safely be postponed to another day."). The question is whether a plaintiff's allegations establish that her treatment "could plausibly be abusive." *Id.*

A few of Kibbons's allegations have a clear link to her sex: that Peloso repeatedly asked her out despite her refusals, told her to climb a ladder in front of him so that he could ogle her, and repeatedly sat in her office and watched her work in silence. On their own, these allegations might suffice to state a claim. But Kibbons has also alleged that Peloso subsequently escalated his

harassment because Kibbons refused his advances.[3] Once this later harassment is considered, all the factors for weighing whether harassment was pervasive or severe weigh in Kibbons's favor. Peloso's alleged actions were frequent: he invited her to drink with him in a cemetery on several occasions, watched her work for a long time for no apparent reason on several occasions, demeaned Kibbons by mocking her for making mistakes despite having a Ph.D. on several occasions, regularly sent Kibbons unnecessarily demanding requests, and continued to harass her even after she had resigned. (Compl. ¶¶ 30–33, 41–42, 48, 104–06.) Peloso's alleged behavior was also severe, physically threatening, and humiliating: he demeaned her, spoke to her in a hostile and aggressive way, yelled at her during a Board meeting and pounded the table with his fists, and made her feel unsafe. (*Id.* ¶¶ 38–39, 55, 57–59.) And drawing inferences in Kibbons's favor, Peloso's actions interfered with her work performance: his harassment caused Kibbons's health and marriage to suffer and also caused her to leave a Board meeting in tears. (*Id.* ¶¶ 40, 58–59.)

Kibbons's pleading burden is not as high as Defendants suggest. "[T]he pleading standards in Title VII cases are different from the evidentiary burden a plaintiff must subsequently meet." *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir. 2013) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). Defendants cite several cases where a plaintiff lost at the summary judgment stage or a jury verdict was reversed despite some evidence of significant harassment. *See Hilt-Dyson*, 282 F.3d at 463–64 (police lieutenant rubbed subordinate's back and,

---

[3] Although the Complaint does not directly state that Peloso's alleged escalation of his harassment was tied to Kibbons's sex—and suggests other motives, including that Kibbons made an issue of potential financial improprieties by the Board—Kibbons's response brief asserts that Peloso continued to harass her because she rejected his sexual advances. A plaintiff may elaborate on her factual allegations in a response brief so long as the elaboration is consistent with her complaint. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (collecting cases). Such an implication can reasonably be read into the Complaint, so Kibbons's elaboration may be considered for purposes of this motion.

during uniform inspection, stared at her chest while asking her to lift her arms up); *Patt v. Fam. Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (coworker made numerous offensive sex-related comments); *Adusumili v. City of Chicago*, 164 F.3d 353, 361–62 (7th Cir. 1998) (plaintiff suffered staring, sexually charged comments, and brief touching from coworker); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430–31 (7th Cir. 1995) (supervisor made numerous sexually charged comments to plaintiff). But none of those cases addressed the issue here: whether Kibbons's allegations present "a story that holds together" and give Defendants "fair notice of [her] claims." *Huri*, 804 F.3d at 834 (internal quotation marks and citation omitted).

Defendants are also incorrect in arguing that Kibbons has only alleged isolated incidents of sexual conduct insufficient to state a hostile environment claim. She has sketched out something more extensive: a prolonged, targeted harassment campaign against her based on her refusal of Peloso's alleged sexual advances. She has not merely alleged that Peloso made inappropriate comments or flirted unwelcomely. *Cf. Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 862–63 (7th Cir. 2011) (affirming grant of summary judgment against plaintiff because supervisor's description of her as "cutie" and as having a "pretty face" was not objectively offensive). Considering Kibbons's allegations in their totality, she has plausibly alleged severe enough harassment to state a claim. *See Alamo*, 864 F.3d at 550–52 (7th Cir. 2017) (holding that plaintiff stated hostile environment claim even though some of the alleged harassment, in isolation, might have seemed trivial).

Last is the issue of whether there is a basis for employer liability. This requirement hinges on whether Peloso was Kibbons's supervisor. An employer is strictly liable for harassment committed by a supervisor against a supervisee unless (1) the harassment did not "culminate in a tangible employment action" (like firing or demotion) and (2) the employer demonstrates, as an

11

affirmative defense, that it "exercised reasonable care to prevent and promptly correct any harassing behavior" and "the plaintiff unreasonably failed to take advantage of . . . preventive or corrective opportunities." *Vance v. Ball State Univ.*, 570 U.S. 421, 429–30 (2013). A "supervisor" is an employee with power "to take tangible employment actions against the victim," like "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 431 (internal quotation marks and citation omitted). A supervisor need not be able to unilaterally effect a tangible employment action; it can be enough to conduct evaluations that may lead to increases in salary or "initiate[] firing and suspending personnel," even if approval from higher management is required. *Id.* at 437 n.8.

Defendants contend that Peloso was not Kibbons's supervisor because he could not unilaterally fire her. Only the Board—of which Peloso is only one member—may make employment decisions regarding the superintendent. *See* 105 ILCS 5/10-16.7. But Defendants' argument is precluded by *Vance*, which holds that a person may be a supervisor even when they cannot fire an employee without approval from a higher-up. Defendants' position, taken to its logical conclusion, would imply that there are no supervisors whenever more than one person must sign off on a tangible employment action. Multiple Courts of Appeals, in the wake of *Vance*, have held otherwise. *See, e.g.*, *Strothers v. City of Laurel*, 895 F.3d 317, 334 (4th Cir. 2018) (ability to give "input on evaluations" carrying economic consequences may establish supervisor status); *Velazquez-Perez v. Devs. Diversified Realty Corp.*, 753 F.3d 265, 272 (1st Cir. 2014) ("[A]t some point the ability to provide advice and feedback may rise to the level of delegated authority sufficient to make someone a supervisor."); *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 738 (10th Cir. 2014) ("A manager who works closely with his or her subordinates and who has the power to ***recommend*** or otherwise substantially influence tangible employment

actions, and who can thus indirectly effectuate them, also qualifies as a 'supervisor' under Title VII.").

Peloso, like the other Board members, provided an annual evaluation of Kibbons's performance. (Compl. ¶ 13.) Peloso also appears to have coordinated Kibbons's evaluation process—he declined her request to view each Board member's individual evaluation, refused her request to meet with the entire Board regarding her evaluation, and served as an intermediary between the Board and Kibbons regarding her second evaluation. (*Id.* ¶¶ 92–96.) On these allegations, and drawing all reasonable inferences in Kibbons's favor, Kibbons has adequately pleaded that Peloso was her supervisor for purposes of her Title VII claim. *See McCleester v. Mackel*, No. CIV.A. 06-120J, 2008 WL 821531, at *9 (W.D. Pa. Mar. 27, 2008) ("The question of whether a particular individual holds a 'supervisory position' over another must be answered by reference to the power that the individual actually holds . . . .") In opposition, Defendants cite a case where summary judgment was granted in favor of a school board for a 42 U.S.C. § 1983 discriminatory discharge claim where the plaintiff presented no evidence that the school board held discriminatory animus against him. *Cameli v. O'Neal*, No. 95 C 1369, 1997 WL 351193, at *17 (N.D. Ill. June 23, 1997). In *Cameli*, there was evidence that the school principal who recommended the firing did so because of the plaintiff's race. *Id.* But the issue that case presented—whether a principal's racial animus can be attributed to a school board for purposes of summary judgment in a § 1983 case—is entirely different from whether a school board member can be a "supervisor" of a superintendent under Title VII.

For these reasons, the Court denies Defendants' motion to dismiss Kibbons's hostile work environment claim.

### B.    Constructive Discharge

Kibbons also claims that she suffered a constructive discharge based on the discriminatory harassment she suffered. A plaintiff can state a claim for constructive discharge under Title VII if she can show that she "was forced to resign because [her] working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). If an employee quits because of discriminatory harassment, she must show "working conditions even more egregious than that required for a hostile work environment claim" to state a constructive discharge claim "because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Id.* (citations omitted).

Defendants are correct that a plaintiff cannot prevail on a constructive discharge claim unless she also establishes a hostile work environment. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004). Ultimately, to prevail, Kibbons must show that she faced "an aggravated situation beyond ordinary discrimination." *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423 (7th Cir. 1989) (internal quotation marks and citation omitted). But Defendants' arguments for dismissing Kibbons's constructive discharge claim are largely the same as those they made against her hostile work environment claim, which have already been rejected.

Defendants do raise two new points. First, they note that Kibbons was offered a contract renewal, which she declined. But that is not particularly relevant here. Kibbons asserts that her working conditions were so intolerable that she had to quit, not that she was formally pushed out of her role. Second, Defendants contend that Kibbons did not give the Board an opportunity to address the harassment. But Kibbons alleges otherwise—she says she made a formal complaint

through counsel in December 2017 and that her counsel again contacted Taft's attorney in January 2018. (*Id.* ¶¶ 70, 78.) Indeed, Kibbons alleges that Taft's attorney promised to address Peloso's harassment. (*Id.* ¶ 79.) Kibbons has adequately alleged that she tried to stop Peloso's harassment, including seeking help from other Board members, but was forced to resign because they were unable to stop him. In sum, because it is plausible that Kibbons suffered severe enough abuse to establish constructive discharge. Accordingly, Defendants' motion to dismiss that claim is denied.

## II.     Count II: Breach of Contract

Kibbons's first state-law claim is for breach of contract. There are two preliminary issues to address.[4] First, the Complaint names both Taft and Peloso as Defendants for the breach of contract claim. But only Kibbons and Taft, not Peloso, were parties to the contract. (Employment Contract at 1.) Thus, Peloso could not have breached the contract and the Court dismisses the breach of contract claim against him with prejudice.[5] Second, Kibbons seeks punitive damages, but Illinois law does not authorize the award of punitive damages for breach of contract claims. *See Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 901 (Ill. 1996); *Leyshon v. Diehl Controls N. Am., Inc.*, 946 N.E.2d 864, 877 (Ill. App. Ct. 2010). Thus, the Court dismisses the breach of contract claim with prejudice to the extent Kibbons seeks punitive damages.

Under Illinois law, "[t]he elements of a claim for breach of contract are (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*,

---

[4] In absence of argument to the contrary from the parties, the Court applies Illinois state law to Kibbons's state-law claims. *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991).

[5] Although Federal Rule of Civil Procedure 15(a)(2) requires the Court to freely give parties leave to amend when justice so requires, the Court may dismiss a claim with prejudice if an amended complaint could not cure the deficiencies in the complaint, rendering the amendment futile. *See Gonzalez-Koeneke v. West*, 791 F.3d 801, 807–08 (7th Cir. 2015).

801 F.3d 777, 786 (7th Cir. 2015) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). Kibbons's Complaint adequately alleges the existence of a valid contract and substantial performance on her part.

However, Kibbons has not adequately alleged breach or injury. She contends that Taft breached the contract by changing the procedures for her performance evaluation without her involvement. But the only corresponding portion of the contract states as follows:

> By February 28, the Board shall review Kibbons' [sic] progress toward established goals, implementations of all duties as set forth in the job description and working relationships among Kibbons, the Board, faculty, staff and the community and shall consider Kibbons' [sic] annual salary for the subsequent year of the Agreement based on these and any other facts the Board deems appropriate.

(Employment Contract at 2.) While the contract requires an annual performance review, it does not require any particular form of review or give Kibbons any control over the review process. Kibbons contends that Taft violated a written Board policy when it changed the manner of review without her involvement. But even assuming that Taft did violate its own policies, that is irrelevant for the breach of contract claim, which concerns the employment contract, not Board policies. Moreover, Kibbons has also failed to allege any injury. She does not allege that the change in the performance review process caused any pecuniary injury or any lost employment opportunity. Indeed, Taft offered Kibbons a contract extension after the performance review of which she complains, so no injury is apparent from the face of the Complaint. Therefore, the Court dismisses Kibbons's breach of contract claim against Taft.

## III.     Count III: Defamation

Kibbons also asserts a claim for defamation against Taft and Peloso. Illinois law provides that "[a] local public entity is not liable for injury caused by any action of its employees that is libelous or slanderous." 745 ILCS 10/2-107. The Seventh Circuit has held that this law makes

16

local school districts in Illinois immune from suits for defamation that arise from statements made by their employees. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 617 (7th Cir. 2001). Kibbons concedes that Taft is so immune. The Court therefore dismisses with prejudice the defamation claim against Taft.

Under Illinois law, the elements of defamation are that "(1) the defendant made a false statement about the plaintiff, (2) there was an unprivileged publication to a third party with fault by the defendant, and (3) the publication damaged the plaintiff." *Parker v. House O'Lite Corp.*, 756 N.E.2d 286, 291–92 (Ill. App. Ct. 2001). Here, Kibbons claims defamation based on Peloso's statements to the Board that he had found Kibbons on the internet and that he would do what he could to ruin her. Relying on those statements only, Kibbons's claim fails for several reasons.

First, there is no indication that Peloso's statement was false. His statement that he would ruin Kibbons is a statement of intent or opinion, not fact. And there is no indication in the Complaint that the statement that he had found Kibbons on the internet was false. Second, the statements are protected by Illinois's absolute privilege against defamation suits for statements made by state and local executive officers in the performance of their official duties. *See Horwitz*, 260 F.3d at 617–18 (holding that absolute privilege protected statements by president of school board, school principal, and school superintendent); *McLaughlin v. Tilendis*, 253 N.E.2d 85, 88 (Ill. App. Ct. 1969) (holding that statements of superintendent to school board were absolutely privileged). The Court may resolve questions of privilege as a matter of law. *See Ashe v. Hatfield*, 300 N.E.2d 545, 548 (Ill. App. Ct. 1973). According to Kibbons's Complaint, Peloso made the identified statements to the Board in his capacity as Board President at a special meeting. (Compl.

¶¶ 104–05.) Thus, absolute privilege applies to Peloso's statements.[6] Third, Kibbons has failed to plead that the statements Peloso made to the Board at that meeting harmed her in any way. The Court therefore dismisses the defamation claim against Peloso with prejudice to the extent that she relies on these statements.

Kibbons hints that Peloso might have made other defamatory statements. (*See* Resp. in Opp'n at 12 (referring to "those defamatory statements to still be discovered"); *see also* Compl. ¶ 132.) But to the extent that the Complaint mentions any other unknown statements, such allegations are conclusory and cannot survive the *Twombly*/*Iqbal* standard for Rule 12(b)(6) motions. Therefore, the Court dismisses the defamation claim to the extent that it concerns unidentified statements by Peloso.

### IV.    Count IV: Intentional Infliction of Emotional Distress

Kibbons's final state-law claim is for intentional infliction of emotional distress ("IIED"). To state a claim for IIED under Illinois law, a plaintiff must allege that "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that his conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress." *Cangemi v. Advocate S. Suburban Hosp.*, 845 N.E.2d 792, 813 (Ill. App. Ct. 2006) (citation and internal quotation marks omitted). A plaintiff must allege distress that "is so severe that no reasonable [person] could be expected to endure it." *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (citation and internal quotation marks omitted). "The intensity and duration of the distress are factors to be considered in determining its severity," as is the amount of power the defendant has over the plaintiff. *Id.* (citation and internal quotation marks omitted). The tort does not extend to "mere insults,

---

[6] Defendants also contend that Illinois's qualified common law privilege protects Peloso from liability. *See Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 133–35 (Ill. 1993). Because the Court has concluded that absolute privilege applies, it is unnecessary to consider qualified privilege.

indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* (citation and internal quotation marks omitted). Instead, "the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80–81 (Ill. 2003). Illinois courts are reluctant to find workplace conduct actionable as IIED outside of extreme circumstances. *See Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 867 (Ill. App. Ct. 2000) (collecting cases); *see also Miller v. Equitable Life Ass. Soc'y of the U.S.*, 537 N.E.2d 887, 889 (Ill. App. Ct. 1989) ("In employment situations, personality conflicts, job performance evaluations, or job transfers are unavoidable and often result in stress. However, if such stress formed the basis for the tort of intentional infliction of emotional distress, virtually every employee would have a cause of action.").

As discussed above, Kibbons has adequately alleged that she suffered from unbearable working conditions and that she suffered discriminatory harassment "even more egregious than that required for a hostile work environment claim." *Chapin*, 621 F.3d at 679. She alleges that Peloso sexually harassed her, retaliated against her, and continued his campaign to "ruin" her even after she left her job. The standard for liability for IIED is quite high—and even higher in the employment context. *See Graham*, 742 N.E.2d at 867. Nevertheless, Kibbons's allegations clearly go beyond "mere insults, indignities, threats . . . or other trivialities." *McGrath*, 533 N.E.2d at 809. For one thing, an IIED claim is more viable when the defendant exercises "control" over a plaintiff, "particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment." *Id.* That is the case here, as Peloso allegedly had authority over Kibbons which he threatened to use to harm her. Further, Illinois courts have found that abusive conduct that would not constitute extreme and outrageous behavior

19

on its own may rise to that level where it is retaliatory—as Kibbons has alleged here. *Graham*, 742 N.E.2d at 867–68; *but see Miller,* 537 N.E.2d at 889 (holding that allegations that coworkers and supervisors were "inconsiderate, rude, vulgar, uncooperative, unprofessional and unfair," without more, did not state claim for IIED).

Kibbons's allegation that Peloso retaliated against her for revealing financial improprieties—and for refusing his advances—further supports that she has adequately pleaded extreme and outrageous conduct. *Graham*, 742 N.E.2d at 868 ("Engaging in abusive conduct to coerce an employee to follow lawful directions, while bad management, constitutes a legitimate objective. But the same abusive conduct, employed to punish whistle-blowing, serves no legitimate purpose." (quoting *Johnson v. Fed. Rsrv. Bank*, 557 N.E.2d 328, 331 (1990))). *Harriston v. Chicago Tribune Co.*, 992 F.2d 697 (7th Cir. 1993), is not to the contrary. There, the plaintiff appealed the district court's dismissal of her IIED claim, which was based on allegations that her employer had taken arbitrary negative actions against her and had failed to respond to her safety concerns. *Id.* at 702–03. The Seventh Circuit held that the alleged behavior "did not go beyond all possible bounds of decency." *Id.* However, the *Harriston* decision did not analyze the aggravating factor of retaliation. That factor tips the scales in favor of Kibbons's claim, at least at the pleading stage.

Defendants do not challenge that Kibbons has adequately pleaded the other elements of an IIED claim against Peloso. She alleges that Peloso engaged in a personalized and vindictive campaign against her, and it can plausibly be inferred that he intended to inflict severe emotional distress against her or knew that his actions might result in such. She also alleges that she suffered severe emotional distress, including feeling physical ill and unsafe and experiencing harm to her

20

health and marriage. Thus, Defendants' motion to dismiss Kibbons's IIED claim against Peloso is denied.

That said, Kibbons has failed to state a claim for IIED against Taft. Other than changing her performance evaluation process, everything of which Kibbons complains was done by Peloso—not by the Board or other Board members. Kibbons alleges that the Board was aware of some of Peloso's actions, including him yelling at her at a Board meeting. But the Board cannot be held liable for IIED just because it observed and failed to stop certain instances of Peloso's allegedly abusive conduct. Nor does Kibbons suggest that some form of vicarious liability applies here. For these reasons, the Court dismisses Kibbons's IIED claim against Taft.

## CONCLUSION

Defendants' motion to dismiss (Dkt. No. 8) is granted in part and denied in part. The motion is denied as to Count I, granted as to Counts II and III, and granted as to Count IV with respect to Defendant Taft only. The dismissals are without prejudice except as otherwise stated in this Opinion.

ENTERED:

Dated:  September 25, 2021

Andrea R. Wood
United States District Judge